## WILLIAMS v. STATE OF INDIANA.

[No. 24,489.   Filed April 3, 1925.]

1. HOMICIDE.—*Competency of dying declarations is for the trial court.*—The competency of a statement purporting to be a dying declaration is for the trial court to be determined by proof relative to declarant's state of mind at the time, whether uttered under a sense of impending death without hope of recovery.   p. 88.

2. HOMICIDE.—*Competency of dying declarations may be determined from surrounding circumstances.*—The competency of a statement as a dying declaration to be determined by the judge of the trial court is not limited to proof of declarant's statements alone, but may be inferred from his conduct, manner, symptoms and condition, which naturally result from the extent and character of his wound or illness.   p. 88.

3. HOMICIDE.—*Dying declarations held to have been made at time of signature, though some time after writing.*—A statement was made by one on the afternoon of his death at about three o'clock, when in the sense of impending death, which was reduced to writing, and read to him and was then left in the possession of his nurse; at about six-thirty he called for it saying he knew he was going to die and wanted to sign it, looked at it and apparently identified it, and signed it in the presence of witnesses; *held*, that the declaration will be treated as having been made, or at least confirmed, at the time he signed it.   p. 89.

4. HOMICIDE.—*The nature of a wound indicating malice warrants an instruction on malice.*—Evidence as to the nature of a wound inflicted, which indicated the use of a dangerous and deadly weapon, without justification or provocation, justifies an inference of malice and warrants an instruction as to the inference of malice to be drawn from the intentional use of a deadly weapon.   p. 89.

5. HOMICIDE.—*Character of weapon question for jury.*—The question whether an instrument used is a deadly weapon is for the jury and will not be considered on appeal to determine the correctness of an instruction concerning malice.   p. 92.

6. HOMICIDE.—*Instruction does not invade province of jury when supported by conflicting evidence.*—Upon conflicting evidence as to the opening move in a personal encounter resulting in death of one, an instruction held not to invade the province of the jury in assuming that the other was guilty of a fatal assault.   p. 92.

7. HOMICIDE.—*Instructions which submit question of provocation upon facts and circumstances surrounding the case, are not objectionable.*—Instructions which submit to the jury the question of provocation upon all the facts and circumstances surrounding the case, to determine the grade of the homicide under §2416 Burns 1926, §2239 Burns 1914 are not erroneous or open to the objection that they do not conform to the evidence. p. 93.

8. CRIMINAL LAW.—*Burden to show harmfulness of instructions is upon objector.*—If an instruction is erroneous and harmful to appellant, the burden is upon him to show that it was. p. 93.

9. HOMICIDE.—*Instructions on question of intent properly refused if already covered.*—An instruction on motive of defendant, tendered by him, which was involved and did not bring to the attention of the jury principles of law bearing on malice or the effect of motive not already covered, is properly refused. p. 94.

10. HOMICIDE.—*Evidence held sufficient to sustain verdict.*—Evidence considered and *held* sufficient to sustain a conviction of murder in the second degree. p. 94.

From Vanderburgh Circuit Court; *Philip C. Gould,* Judge.

Marvin Williams was convicted of murder in the second degree, and he appeals. *Affirmed.*

*Lindsey & Lindsey,* for appellant.

*U. S. Lesh,* Attorney-General, *Mrs. Edward Franklin White,* Deputy Attorney-General, and *O. S. Boling,* for the State.

MYERS, J.—Appellant was indicted, tried and convicted in the Vanderburgh Circuit Court of murder in the second degree. Judgment in accordance with the verdict. §2415 Burns 1926, §2238 Burns 1914. Appellant's motion for a new trial, the overruling of which is the only error assigned, questioned the action of the court in admitting in evidence the purported dying declarations of the deceased; the giving of instructions Nos. 5, 7, and 12 upon the court's own motion, and the refusal to give instruction No. 7 tendered by appellant;

insufficient evidence to sustain the verdict; and verdict contrary to law.

In substance, the evidence in part shows that on September 27, 1922, at about seven o'clock p.m., Walter Walker was riding a bicycle on one of the streets of Evansville when the appellant accosted him saying: "Wait a minute, I want to see you." Walker stopped. Appellant, while advancing toward Walker, said: "I understand you have been talking about me and my girl," but as to what was said after appellant came up to Walker, or which one started the physical encounter, there is a conflict in the evidence. However, only a few seconds of time elapsed until the combat commenced. Both fell to the ground, appellant on top of Walker, but while in the scuffle, both arose to their feet, each having hold of the other, when they were separated by a third party. After the separation Walker sat down upon nearby steps leading from the sidewalk into a dwelling house, and appellant went into an adjoining home where his fiancée resided with her parents. Appellant, who was twenty-seven years old, was the only person in a position to do Walker bodily injury. Walker immediately began to complain of misery in his stomach. He was later assisted to his home a short distance away. A doctor was called who, about eight o'clock, made an examination of Walker's person and found a wound very close to his navel made by a knife or some sharp instrument, and on inserting a probe found that it had extended into the abdomen. Walker was suffering intensely and the doctor ordered him removed to a hospital where, at about 9:30 p.m., a surgical operation disclosed that his stomach had been punctured and the food was escaping therefrom. The surgery completed, he remained in the hospital and gradually grew weaker and died the next evening between eight and nine o'clock from peritonitis due to the effects of the wound.

Between two and three o'clock in the afternoon of the day Walker died, the deputy prosecuting attorney of Vanderburgh county called on him at the hospital, when and where Walker made the following statement:

> "I, Walter Walker, realizing that I am about to die and having no hope of recovery, make the following statement in order that the authorities may know how this cutting of me by Marvin Williams occurred.
>
> "Williams was with Ruth Worman in front of her house. I was taking my grandmother over to my aunt's and we passed Williams and Ruth Worman. I asked Worman's brothers when Williams was going to marry Ruth.
>
> "Williams asked me to wait a minute. I told him alright and I stopped. Williams jerked off his coat, pulled out his knife and stabbed me in the stomach and just about the same time I hit at him in the chin with my fist but he had already stabbed me when I struck him. When I fell down I fell on my side and he got on top of me and held me down. I was not angry at the time and gave him no cause or reason for stabbing me.
>
> Walter Walker.
>
> "Louise Kratz Eiceman, Witness."

This statement was made to, reduced to writing, and then read to the deceased by the deputy prosecuting attorney in the presence of the nurse in charge of him at the hospital. It was not signed until about 6:30 that evening. From the time of making the statement until he requested that it be returned to him for signature, it was continuously in the possession of this same nurse who testified that he called for it, saying: "'I can't get well and I want to sign that statement that I had written out this afternoon because,' he said, 'I am going to die and I want to sign it,' and I said, 'Here it is,' and he looked at it and I gave him a drink of water and moistened his tongue and he signed it and said 'Thats all.'" The matron of the hospital was present at the time the statement was signed, whose testimony fully

corroborated the testimony of the nurse. This witness also testified that when the statement or paper was handed to the deceased he took it, looked at it, examined it and apparently identified it as the same paper he had seen. The nurse then supported him and he signed it. "I felt that he knew just what was on the paper," but didn't think he was able to read it. He was cold and clammy, suffering a great deal and, in appearance, he was approaching death.

The foregoing written statement of the deceased was admitted in evidence over appellant's objection "that at the time the statement was made the deceased did not at that time believe he was going to die and had not given up all hope of recovery"; that at the time he signed the statement it was not read to him nor did he read it himself.

The competency of this evidence was a question for the trial court to be determined by the proof relative to the declarant's state of mind at the time he made the declarations. The proof preceding the admission of such declarations must convince the trial judge that they were uttered under a sense of impending death without hope of recovery, or that the declarant fully believed that death was so near that all motives to falsehood were superseded by the strongest motive to strict veracity. *Williams* v. *State* (1907), 168 Ind. 87; *Gipe* v. *State* (1905), 165 Ind. 433, 1 L. R. A. (N. S.) 419, 112 Am. St. 238; *Watson* v. *State* (1878), 63 Ind. 548; *Morgan* v. *State* (1869), 31 Ind. 193; *Jones* v. *State* (1880), 71 Ind. 66.

Proof of the fact thus to be settled by the judge is not limited to the declarant's statements alone, "but it may be inferred from the general statements, conduct manner, symptoms and condition of the declarant, which flow as the reasonable and natural

results from the extent and character of his wound, or the state of his illness." *Williams* v. *State, supra,* p. 90.

In the instant case we are disposed to treat the written declarations of the deceased as having been made, or at least confirmed, at the time they were signed. Preliminary to their admission, the trial court was fully advised of all the circumstances tending to show the state of mind of the deceased at the time he signed the statement. True, the expressions were actually enunciated a few hours before they were signed, but it is clearly apparent from the evidence that he called for and had in hand his afternoon statement of the facts as they occurred the evening before. He looked at it, he examined it, and although his life was rapidly fading away, he impressed those within his presence that he knew what he was affirming by his signature. He was continually growing weaker. As stated by the witness, "He was cold and clammy." He said, "I know I am dying and I want to sign that statement I made this afternoon."

It would seem to us that the evidence before the court on the subject in question was amply sufficient to sustain a finding that the declarations of the deceased were made at the time when every motive of falsehood was silenced and the mind controlled by solemn considerations to speak the truth. The objections of appellant to the admission in evidence of the foregoing declarations of the deceased were properly overruled.

Looking to the instructions given, of which complaint is made, Nos. 5 and 7 may be considered together. No. 5 purports to define the word "malice" as used in the statute defining "murder," and No. 7 admonished the jury that it would not be authorized in finding the defendant guilty of either murder in the first or second degree upon convincing evidence

alone that such killing was feloniously and purposely done. The evidence must go farther and show that it was done with malice on the part of the defendant toward the deceased. This instruction also stated under what circumstances malice may be inferred and when not. The first of these instructions was held to state the law correctly in the case of *Davidson* v. *State* (1893), 135 Ind. 254, 263. See, also, *Coghill* v. *State* (1871), 37 Ind. 111; *Welty* v. *State* (1912), 180 Ind. 411, 429. The last sentence of instruction No. 7, and the part here questioned, was approved in the case of *McDermott* v. *State* (1883), 89 Ind. 187, and reads as follows: "Where a homicide is perpetrated by intentional use of a deadly weapon, in such manner as is likely to and does produce death, the law presumes such homicide was committed purposely and maliciously, unless it was done in self-defense or upon a sudden heat, occasioned by such provocation as is adequate in law to reduce the killing to the grade of manslaughter."

Both of the foregoing instructions are attacked upon the ground of failure of evidence showing that appellant perpetrated a deliberate cruel act, or that he used a deadly weapon in a manner likely to produce death.

In addition to the evidence already mentioned, it appears that the deceased was five feet five inches tall and weighed about 125 pounds. The muscles or wall of his abdomen was two inches thick and was pierced by a knife or some other sharp instrument. The path of the wound was upward. At the point of entry it was about the width of a man's finger and terminated by a slit in the stomach about an inch wide. Appellant was a machinist, and on the day of the trouble he quit work at five o'clock and after his evening meal he went to a restaurant at the corner of Garvin and Eichel Streets in the city of Evansville where he knew Walker was a frequent evening visitor. He inquired for Walker and

on being told that he was a little too early for him, he left for "the home of his girl," which was two blocks away. Shortly after his arrival there, and while talking with the young lady on the porch, Walker came along the street on his bicycle. We have already stated, in substance, what then followed between them.

Appellant testified at the trial that his inquiry for Walker at the restaurant was not for the purpose of any trouble. "The only thing, he had been talking about me, I heard, and talking about my girl and my folks, and I just wanted to ask the man why he did this, whether it was for a joke or what he meant by it, and I wanted it straightened out, was all." When arrested appellant had on his person a pocket knife fastened to one end of his watch chain, blade one-fourth inch wide, one and three-fourths inches long, length of knife over all, four inches; also a sharp pointed finger nail instrument, blade one-fourth inch wide, one and one-fourth inches long, handle and blade, three and three-fourths inches long.

We have read carefully the evidence disclosed by the record in this case, and from which we conclude that the jury had much evidence tending to show that appellant perpetrated the cruel act deliberately, and that the act which caused Walker's death was committed by appellant. Counsel for appellant suggests that the wound might have been inflicted by an open knife on the person of Walker, but there is absolutely no evidence to sustain such insinuation. The character of the instrument was reflected by the description of the wound inflicted. *Thomas* v. *State* (1902), 44 Tex. Cr. Rep. 344, 72 S. W. 178. True, no witness testified as having seen the instrument, but the effect it produced strongly confirmed its deadly qualities. Hence, as said in the case of *State* v. *Bowles* (1898), 146 Mo. 6, 47 S. W. 892, 69 Am. St. 598: "A deadly weapon is any weapon

instrument by which death would likely be produced, when used in a manner in which it may appear it was used in the affray."

In the instant case it was for the jury to say from the evidence whether or not the instrument used was a deadly weapon. For this court to affirm that 5. there was no evidence justifying the jury in finding that the instrument used as it was in a vital part of Walker's body was not dangerous or deadly, is out of the question. *People* v. *Lopez* (1901), 135 Cal. 23, 66 Pac. 965.

We may very well assume that the jury found the facts in keeping with the evidence, and if so, it might well have concluded that the weapon by which the wound was inflicted was dangerous and deadly, its use unjustified and without provocation. These facts appearing, malice may be inferred. *Murphy* v. *State* (1869), 31 Ind. 511; *Ex parte Moore* (1868), 30 Ind. 197; *Benjamin* v. *State* (1906), 148 Ala. 671, 31 So. 739; *State* v. *Bowles, supra*. We therefore conclude that the above instructions were within the evidence and no error was committed in giving them.

Instruction No. 12 was on the subject of provocation, and under what circumstances passion will mitigate the offense and reduce the crime from murder to 6. manslaughter. This instruction is one of a series of four referring to this same matter, and in all probability it was the court's conception of the law as expressed in *Henning* v. *State* (1886), 106 Ind. 386, 400, 55 Am. Rep. 756. There was evidence tending to show that the deceased began the combat by first striking appellant in the face with his fist. The question of sufficient provocation was thus injected into the case and naturally called for an instruction upon that subject.

Appellant first insists that this instruction invades

the province of the jury by assuming that appellant had committed the act charged against him. We are not convinced that it is subject to the asserted infirmity.

It is next insisted that it was error to submit the question of a sufficient provocation to reduce the killing from murder to manslaughter upon all the facts and circumstances surrounding the case, when the question should have been limited to the circumstances shown by the evidence. By statute, voluntary manslaughter is the unlawful killing of any human being without malice upon a sudden heat. §2416 Burns 1926, §2239 Burns 1914. The statement in the opinion in the case last cited, and in the instruction, that "it is the provocation that reduces the crime to the grade of manslaughter," is not, standing alone, technically accurate. It is the sudden and violent heat of passion, induced

7. by sufficient provocation, and not the provocation which reduces the homicide from murder to manslaughter. There may be an adequate provocation under circumstances that would not distract the mind of the actor from a cool and deliberate purpose of forming a plan to take the life of the person killed. In such case, the provocation, although seemingly adequate, would not necessarily reduce murder to manslaughter. *Johnson* v. *State* (1906), 129 Wis. 146, 108 N. W. 55, 5 L. R. A. (N. S.) 809, 9 Ann. Cas. 923.

Sufficient provocation is a question of fact for the jury, but what is meant by the term, sufficient provocation, or adequate provocation, when related to unlawful homicides, very properly merits some expression from the trial court. The instant instruction committed this feature of the case to the jury upon all the surrounding facts and circumstances, and explained generally its meaning. If the instruction was erroneous and

8. harmful to appellant, the burden was upon him to show that it was. He has not directed our

attention to a single fact or circumstance thus brought to the attention of the jury, detrimental to him, that would have been excluded by an instruction expressly limiting the question of provocation to the facts and circumstances shown by the evidence. Moreover, when all the instructions on this subject are considered together, as they must be, appellant has no grounds for complaint.

Instruction No. 7 requested and refused was on the subject of appellant's motive in making inquiry for Walker at the Thomas Restaurant. The only purpose of this instruction was to submit to the jury the question of appellant's intention in case he found Walker there. This instruction was greatly involved by recitals from appellant's testimony, given at the trial, relative to his object in making the inquiry. It did not bring to the attention of the jury principles of law bearing upon the subject of malice or the effect of proving a motive in this class of cases which had not been fully explained and covered by other instructions given to the jury. It was not error to refuse the instruction.

Finally, without extending this opinion for the purpose of reconsidering the evidence, we think it apparent from the evidence to which we have already referred that it was sufficient to sustain the verdict and therefore the verdict was not, for that reason, contrary to law.

Judgment affirmed.