## Terrell v. Commonwealth.

(Decided April 28, 1922.)

### Appeal from Perry Circuit Court.

1. Indictment and Information—Endorsement—Signature of Foreman. —The requirement of section 119 of the Criminal Code of Practice that an indictment "must be indorsed 'a true bill' and the indorsement signed by the foreman" is mandatory and the indictment should be quashed or set aside if the proper steps are taken in the trial court for that purpose; but if no such steps are taken the non-compliance with the section will be deemed as waived.

2. Indictment and Information—Signature of Foreman—Sufficiency. —A signing of a writing, under the rules of the common law, and in the absence of a statute prescribing otherwise, does not necessarily mean that the required signature should be at the end or bottom of the thing required to be signed, it being sufficient if it appears anywhere in the body of the writing or in immediate juxtaposition to it at the top, sides or bottom, if the act of writing the signature was with the intention to comply with the law requiring signing.

3. Indictment and Information—Signature of Foreman.—Section 468 of the Kentucky Statutes refers to writings which must be executed by *parties* and does not include the signing of the name of the foreman of the grand jury to the indorsement "a true bill" on the indictment, and if the name of the foreman is signed immediately above that indorsement section 119 of the Criminal Code is complied with, since the purpose of the indorsement, as well as the signing, is to verify the action of the grand jury in returning the indictment and to evidence the fact to the defendant, as well as the court, that the written accusation was in fact voted and returned by the grand jury; and that purpose is as much accomplished when the name of the foreman is written immediately above the indorsement as when written immediately below it.

4. Indictment and Information—Signature of Foreman.—Neither is it necessary that the word "foreman" should follow or be annexed to the name of the signing grand juror, since the section of the

Code does not require the writing of that word but only that the one whose name is written is *in fact* foreman; and in the absence of an affirmative showing to the contrary it will be presumed that the one whose signature appears was foreman and that fact is rendered conclusive when the order of court filing the indictment so recites.

5. Criminal Law—Instructions.—Where there is no evidence to justify the giving of a self-defense instruction it is improper to do so, but notwithstanding the impropriety such an instruction is harmless and does not operate to defendant's prejudice.

6. Criminal Law—Officer Shooting Without Warrant.—Where the defendant was an officer with no warrant to arrest the deceased whom the defendnt claimed had committed a misdemeanor in his presence, intentionally and purposely shot in the direction of the deceased, who was fleeing, in such reckless manner as to shoot and kill him, but not with that purpose in view, the crime of voluntary manslaughter is committed, and in that case there is no room for an instruction on involuntary manslaughter, since it is committed through the reckless handling of a pistol or firearm, but with no intention to shoot, and where the shooting was the result of some accident superinduced by recklessness.

7. Homicide—Question for Jury.—The deceased was only about ten feet from defendant when the fatal shot was fired, and he was riding a mule, and was shot about the middle of the back. Defendant testified that he intended to shoot over the head of deceased to frighten him and induce him to surrender, but he stated to others at the time that he intended to shoot the mule and thereby prevent the flight. The only crime of which the deceased was guilty, if any, was a misdemeanor. Held, that it was for the jury to determine whether the shooting was done with malice aforethought so as to create the crime of murder, and its finding to that effect under the facts proven can not be considered as flagrantly against the evidence.

F. J. EVERSOLE, J. T. BOLING and JESSE MORGAN for appellant.

CHAS. I. DAWSON, Attorney General, and THOMAS B. McGREGOR, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

A short time after sundown, and before it became dark, on the evening of August 10, 1921, the appellant, Kye Terrell, in Perry county near the mining camp of the Blue Diamond Mines, shot and killed Lee Combs, a youth nineteen and one-half years of age. He was afterwards indicted for the homicide by the grand jury of the county in which he was charged with the crime.

of murder, and upon his trial thereunder he was convicted and his punishment fixed at life confinement in the penitentiary. His motion for a new trial was overruled and from the judgment pronounced upon the verdict he prosecutes this appeal, his counsel urging a number of reasons why, in his opinion, the judgment is erroneous.

The first, and indeed, according to our view, the only one possessing even the semblance of merit, is that the indictment was not indorsed and signed as required by section 119 of the Criminal Code of Practice, which says: "The concurrence of twelve (but now under the Constitution, section 248, nine) grand jurors is required to find an indictment; when so found, it must be endorsed 'a true bill,' and the indorsement signed by the foreman." Upon the back of the indictment there was signed the name, "G. W. Eversole," and immediately thereunder, and slightly to the right, was the indorsement "a true bill." The order of the court filing it recites that it was received from the hands of the *foreman* in the presence of the grand jury and filed in open court and that the grand jury, after answering to the call of their names, "through their foreman reported an indictment against Kye Terrell, charging him with the crime of wilful murder, said indictment was endorsed, a true bill, by the foreman of the grand jury, and was handed by the foreman of the grand jury in the presence of the grand jury to the clerk of this court, who marked same filed as the law directs." The purpose of the requirement, that the indictment shall be indorsed "a true bill" and that it shall be signed or certified as such by the foreman of the grand jury, is to unerringly identify the indictment and to evidence the fact that it was concurred in by the grand jury in the manner required by law, and such indorsement constitutes the only competent evidence that the paper filed is an indictment legally found. Oliver v. Commonwealth, 95 Ky. 372; Pence v. Commonwealth, idem 618, and Patterson v. Commonwealth, 86 Ky. 313, also reported in 99 Ky. 610. Those cases, as well as those of Commonwealth v. L. & N. R. R. Co., 17 Ky. L. R. 562 (two cases), and same v. same, idem 563, hold that the code requirements as to the indorsement and signature of the foreman are mandatory, and the opinion in the Pence case holds that when the order of court recites a compliance with the section of the code it will be sufficient evidence of that fact unless the record af-

firmatively shows to the contrary. In that case the record did not show *any* indorsement or signing on the indictment, but the order recited that each was properly made and it was held that the court would presume that they were omitted from the transcript by mistake or oversight of the clerk in copying it. In this case, however, the point was raised in the court below and we think that fact sufficient to overcome the presumption which the court indulged in the Pence case. The gravamen of the contention now under consideration is that the indorsement, ''a true bill,'' appearing upon the indictment was not ''signed'' within the contemplation of the law by the foreman of the grand jury and as is required by section 119, *supra,* of the criminal code, because the name of the foreman was not written under that indorsement, but instead it was written immediately above it; and in support of the contention, section 468 of the statutes is relied on. That section says: ''When the law requires any writing to be signed by a party thereto, it shall not be deemed to be signed unless the signature be subscribed at the end or close of such writing.'' If, therefore, the ''writing'' referred to in that section, the signing of which is required to be at its end or close, was intended to include the signing of the name of the foreman upon the indictment as required by section 119 of the criminal code, then there exists some grounds for this extremely technical objection.

At common law and in the absence of a statute prescribing a requirement to the contrary, the ''signing'' of any writing which the law required to be so evidenced need not be at the end, bottom or close of the paper, but the signature to be effective may be placed either at the bottom, top, middle, side or margin of the paper by the one whose duty it was to sign it and if so written with the intention that the written name should perform the legal requirement of a signature the writing would be deemed as legally and properly signed. In other words, at common law the precise place on the writing where the signature was made was neither material nor essential. In 25 A. & E. Ency. of Law, second edition, page 1065, the text upon this subject says: ''Although the words 'sign' and 'signature' sometimes import a signature at the bottom of the instrument, yet in neither ordinary nor legal use are they confined to the writing of the name at the bottom of a paper. An instrument is signed where the name appears at the bottom,

top, middle or side of a paper, if such name was intended as a signature.''

Some of the cases supporting the statements of the text are: Auzerais v. Naglee, 74 Cal. 60; California Canneries Co. v. Scatena, 117 Cal. 447; Wise v. Ray, 3 Green (Iowa) 430; Drury v. Young, 58 Md. 546, 42 Am. Rep. 443; Davis v. Shields, 26 Wend. (N. Y) 341; Adams v. Field, 21 Vt. 256; Tingley v. Bellingham Bay Boom Co., 644; Sarah Miles' Will, 4 Dana 1; Allen v. Everett, 12 B. Mon. 378, and Soward v. Soward, 1 Duvall, 126. Those cases deal with questions growing out of the proper execution of contracts required by the statute of frauds to be in writing and ''signed by the party charged,'' and questions involving the proper execution of wills under statutes requiring them to be *signed* by the testator. The original English Statutes, upon those two subjects, used the word ''signed'' when referring to the execution of the writing, and the English courts, as will be seen from the cases, *supra,* held that in as much as there was no statutory requirement as to the place on the writing where the signature should appear, it was competent under the common law rule for it to appear anywhere thereon or therein if written with obligatory intention. Many of the earlier statutes of the states were phrased similarly to the English statutes and were given the same construction. Thus, in the cited Vermont case of Adams v. Field (which was a will case, and the name of the testator appeared at the beginning or in the body of the will, as was also true in the first two Kentucky cases cited above), the court said: ''The etymology of the word 'sign' does not necessarily require the signing to be at the bottom of the instrument; and it is much a matter of taste, as to the place of signing.'' The other cases cited announce the same rule in substance, and the New York case of Davis v. Shields, as well as the Soward case, *supra,* from this court, points out the etymological distinction between ''signing'' and ''subscribing'' a writing, the latter meaning a signature at the end or bottom thereof. Hence, the court in both of the two latter cases held that the signature must be at the end or bottom of the writing involved, because there had been a change in the requirement of the prevailing statute by substituting the word ''subscribed'' for the word ''signed.'' Moreover, if such was not the common law rule with reference to the signing of a writing there could have been no purpose in the enactment of section 468, *supra,* for if

that rule required the signature to be at the end or bottom of the writing the statute would be superfluous.

We, therefore, conclude that, unless the "signing" by the foreman of the grand jury of the required in- dorsement, "a true bill," is included in, and to be gov- erned by, the provisions of section 468 of the statute the signing by the foreman need not be *under* the indorse- ment but it is sufficient if it is placed in such juxtaposi- tion thereto as to clearly indicate that it was the inten- tion of the foreman to comply with the code require- ments in writing his name thereon. The rule is so stated in the text of 22 Cyc. 255-256, and it was so held by the court in the cases of State v. Bowman, 103 Ind. 69, 2 N. E. 289, and State v. Hogan, 31 Mo. 340; the text of the work referred to, which is supported by the cases cited, says: "But a variance from these words (the required indorsement and the signature of the foreman) will not be fatal, if they are followed in substance, and it is im- material, in the absence of express provisions in the statute, on what part of the indictment the indorsement or the signature (of the foreman) appears, or that the signature does not immediately follow the indorsement." In the case of Commonwealth v. Ripperdon, Littell's Select cases (16 Ky) 194, it is said: "It is, therefore, a general rule, whenever a statute provides that a thing shall be done, without prescribing the mode of doing it, that it shall be done according to the common law mode." Since, therefore, the foreman's signature in this case was sufficient, unless controlled by the section of the statute, *supra,* it becomes necessary to determine its effect, if any, upon that question.

It will be observed that the *writing* therein referred to is one which is required "to be signed by a *party* thereto." This carries with it the irresistible inference that the writing therein mentioned was such as required "parties" to execute it and which conferred rights and imposed obligations upon those who did execute it, or for or on whose behalf it was executed and includes only such writings as are contractual or quasi contractual in their nature and to which there must necessarily be par- ties. The foreman of the grand jury is not such a party to an indictment or to the required indorsement on it. His signature, as we have seen, is only for the purpose of evidencing the legality of the finding of the indict- ment and to verify, to the defendant and the court, the fact that the particular paper contains the accusation

under which the defendant is to be tried. No obligation of any character is assumed or required to be assumed by the foreman and no rule of correct or rational construction can extend the provision of the statute to the requirements of the section of the criminal code referred to. We, therefore, conclude that the fact of the signing of his name by the grand juror in this case immediately *above* the indorsement, "a true bill," is not fatal to the indictment.

But, it is insisted that the name, "G. W. Eversole," as signed by him, was not followed by the word, "foreman," and for that reason it is insufficient. The section of the code, *supra,* does not in terms or by implication require that the word, "foreman," shall follow or be attached to the name of the grand juror who signs the indorsement. It only requires that such person shall *be* foreman of the grand jury; and in the absence of an affirmative showing to the contrary it will be presumed that the member of the grand jury whose name appears was its foreman. In the volume of Cyc., *supra,* on pages 256-257, it is stated that, "The indorsement and signature are not insufficient because the word 'foreman' after the signature is not followed by the words 'of the grand jury,' or because it is misspelled, or even because it is omitted altogether, for the records may be examined to ascertain who was foreman." To the last statement in the quotation there is appended the cases of State v. Bowman, *supra;* Beard v. State, 57 Ind. 8; State v. Soapher, 35 La. Ann. 975; Com. v. Read, Thach. Cr. Cas. (Mass.) 180; State v. Chandler, 9 N. C. 439; Whiting v. State, 48 Ohio St. 220, 27 N. E. 96; Com. v. Ferguson, 8 Pa. Dist. 120; State v. Brown, 31 Vt. 602. Instead of it affirmatively appearing in this case that G. W. Eversole was not the foreman of the grand jury, it affirmatively appears from the order hereinbefore recited, that he was its foreman and this ground must also be determined as without merit. We, therefore, come to a consideration of the other errors complained of, which being immaterial, as heretofore indicated, will be briefly disposed of.

It will be necessary for that purpose to first make a brief statement of the facts as shown by the record. Defendant was, and had been for a month or more, a deputy sheriff of Perry county and was assigned to the Blue Diamond Mines as a place for the performance of his duties. He conceived the idea that moonshine whiskey

was being brought to the mines over a road leading thereto which ran along First creek, and to apprehend any one guilty thereof he and another deputy sheriff, Johnny Combs, at defendant's request, stationed themselves at a bend of that road some distance from the mining camp and at a point where there were large trees and a rock bluff. It was a moonlight night and, just before dark, deceased came along the road riding a mule, and there was across the saddle an old fashioned pair of saddle bags. As they saw him approaching the two went to the edge of the road and defendant was within three or four feet of him when he passed. Defendant claims to have seen the neck of some bottles extending from the saddle bags from under the lids and he commanded the deceased to "halt," but instead of doing so, according to his testimony, he spurred the mule and started down the road and defendant shot at him when only about ten feet away, and he immediately fired two other shots. Defendant's account of how the homicide occurred was thus stated by him:

"It was reported that there were some bootleggers coming in that evening, and I went up there and asked Johnnie Combs to go with me to help put the whiskey out, and he did so, and we went up there and this boy came along, and I asked Johnnie what to do about it, and he said—and I said 'will we stop him' and he said 'it will be all right to stop him' and I walked down, I could not say more than 10 or 15 feet from the county road; and I walked down to the edge of the road, and told him to halt, I saw the jugs in the saddle bags, and I called him to halt; I was just ready to lay my hand up on the saddle bags, and he spurred his mule and started running off, and I shot. I won't say that I hit the boy, nor that I didn't."

The pistol was a 38 caliber and what is known as an automatic special. But one shot struck the deceased and it was in the back two or three inches from the spinal column in the region of the kidneys, just over the hip. He lived something over thirty-six hours, and stated that the first shot struck him and that when defendant spoke to him he became frightened. He fell from the mule at a distance of about thirty feet from where defendant was standing when he did the shooting. The other deputy, Johnny Combs, in stating how the shooting occurred, said that defendant halted the deceased, "and I saw him throw his head back that way, and the mule started down

the road, and I saw Terrell throw his gun up, and the gun fired, and just a little after the two other shots fired the mule went on a few steps and the man fell off.'' The appellant testified that ''I was trying to shoot over him'' intending thereby to frighten him, but he told others on the ground that night, including his companion deputy, that his intention was to shoot the mule so that he could arrest deceased; and that he was told by Johnny Combs to shoot the mule from under the deceased which he was intending to do, but said to the witnesses that ''I guess I got too high and hit the boy.'' Johnny Combs denied having told him any such thing. After the shooting it was found that the saddle bags contained four gallon jugs of moonshine whiskey.

Upon the evidence, as thus briefly outlined, the court instructed the jury on murder, and voluntary manslaughter, and gave the usual reasonable doubt instruction as to the defendant's guilt as well as to the degree of the offense committed, if any, and there was likewise an instruction on self-defense of both appellant and Johnny Combs, the other deputy sheriff who was with him. There was also an instruction defining the rights of the appellant in attempting to make the arrest, if the jury believed that he saw the jugs of moonshine whiskey in the saddle bags and that defendant believed and had reasonable grounds to believe that they contained intoxicating liquor, in which case, as the instruction said, ''said defendant had the right to use such force as was reasonably necessary therefor, if the arrest was forcibly resisted, even to the taking of the life of the deceased, Lee Combs, but he had not the right to use unnecessary force or violence or to shoot or otherwise injure the deceased unless the deceased forcibly resisted the arrest.'' The quoted portion of the instruction is more favorable to defendant than he was entitled to under the law, since the offense, though committed in his presence, was only a misdemeanor and there was no evidence of any forcible resistance by deceased and defendant had no right, in order to effect the arrest, to inflict death or bodily harm. The case would be different if the arrest had been made and the deceased was forcibly trying to escape, or was forcibly resisting the arrest, assuming defendant's right to make it. These principles of the law have been so often reiterated by this court as not to require the citation of cases.

Complaint is made that it was error to give the self-defense instruction. We agree that it was improper to do so, since there was no evidence upon which it could be based, but it does not necessarily follow that because the instruction was improper it was error to give it. In the cases of McClerland v. Commonwealth, 11 Ky. L. R. 301, and Davis v. Commonwealth, 193 Ky. 597, the same instruction was given without supporting evidence to sustain it, and it was held that the impropriety in giving it was harmless to the defendant. It is also insisted that the court should have given an instruction on involuntary manslaughter, and in support of this contention the case of Lewis v. Commonwealth, 140 Ky. 652, is relied on. But, in that case the defendant, Lewis, testified that he did not intend to fire the fatal shot, which, as he claimed, was accidental because his pistol was an automatic one and was caused to fire by his stumbling against a brick on the walk upon which he was traveling, and without any voluntary act on his part though he was *recklessly* carrying and handling it, which fact, if true, constituted the offense of involuntary manslaughter and the court held it was error not to give it. In this case we have no such testimony; the shooting, as testified to by defendant, was voluntary and intentional, and it was for the jury to determine whether the theory of defendant was true or whether he intended to shoot the deceased. We are not prepared, under the facts and circumstances appearing in the record, to say that they arrived at an improper conclusion. Besides the contradictions of defendant as to whether he aimed his pistol at the mule or above the head of deceased, we have the further fact that he was within ten feet of his target when he fired the fatal shot and, surely, he could avoid hitting as large an object as a man's body, or a mule, within that short distance.

The only remaining complaints are that the court erred in admitting and rejecting testimony. The rejected testimony was that the court refused, on cross-examination, to permit Johnny Combs to state whether, since he had been deputy sheriff, "different persons had not brought whiskey into this camp" and sold and distributed it. We do not regard the testimony as relevant, but if otherwise the witness stated the same in substance in his examination in chief, and the defendant also testified to the same fact. The alleged improper testimony complained of was that given by the father of deceased,

who exhibited the saddle bags before the jury containing four glass gallon jars or jugs, the same as they contained on the fatal night, and showed that they could not be seen protruding from the top, as defendant claimed that he did see them. This evidence was perfectly competent, but if otherwise it was not prejudicial because the offense here consisted not in the fact that deceased had committed an offense in the presence of defendant but in his wrongful and unlawful shooting him in attempting to arrest him. The discovery of the receptacles in the saddle bags, at most, only dispensed with the necessity of a warrant which defendant did not have, and clothed him with no greater rights than if he had possessed one.

It is also insisted that no malice is shown; but that was a question for the jury to determine under the facts and circumstances in the case. Malice aforethought, necessary to constitute murder, has been frequently held by this court as meaning "a predetermination to do the act of killing without legal excuse, and it is immaterial how suddenly or recently before the killing such determination was formed." The jury may look to all the facts and circumstances in arriving at its finding as to the existence of that necessary element to constitute murder, and under the apparently cold blooded method by which the deceased in this case lost his life, we are not prepared to say that the jury's verdict finds no support in the record.

Upon the whole case, we find no error prejudical to the substantial rights of the defendant, and the judgment is affirmed.