Van **JOHNSON**, Appellant,

v.

**STATE** of Indiana, Appellee.

No. 48S02–9503–CR–345.

Supreme Court of Indiana.

Sept. 25, 1995.

Montague M. Oliver, Jr., Anderson, for appellant.

Pamela Carter, Atty. Gen., Julie Zandstra Frazee, Deputy Attorney General, Indianapolis, for appellee.

ON PETITION TO TRANSFER

SULLIVAN, Justice.

■ This case implicates the following principle enunciated by Chief Justice Shepard in *Penley v. State* (1987), Ind., 506 N.E.2d 806:

> The notion that the State may not punish a person for his character is one of the foundations of our system of jurisprudence. Evidence of misconduct other than that with which one is charged ("uncharged misconduct") will naturally give rise to the inference that the defendant is of bad character. This, in turn, poses the danger that the jury will convict the defendant solely on this inference.

*Id.* at 808.

On June 18th 1992, a jury convicted Dr. Van Johnson in Madison Circuit Court of Voluntary Manslaughter,[1] a Class A felony. The trial court, having found that aggravating circumstances outweighed mitigating circumstances, enhanced the presumptive sentence of 30 years by 10 years and suspended 10 years.

Johnson appealed, and the Court of Appeals affirmed his conviction. *Johnson v. State* (1994), Ind.App., 645 N.E.2d 643. Johnson then petitioned this court to transfer the decision of the Court of Appeals, and we granted his petition on March 10, 1995. We now reverse.

The Court of Appeals adequately stated the facts of the case and we simply quote from its opinion:

> The facts most favorable to the judgment disclose that on the evening of June 10, 1990, James Wagner was at an apartment complex in Anderson, Indiana, collecting money from customers of his children's newspaper route. When Wagner came to the door of Johnson's apartment, Johnson opened the door and shot Wagner in the chest. Wagner died almost instantly.
>
> Johnson dragged Wagner's body from the porch into his apartment. He then called his attorney. Approximately twenty minutes after the shooting, Johnson called 911 to report that he had "accidentally" shot someone. When the police arrived at Johnson's apartment, they knocked on the door but did not receive an answer. After knocking a second time, Johnson opened the door very slowly and said, "I am not armed." Inside the apartment was Wagner's body. Johnson showed the police officers the shotgun he had used to kill Wagner and admitted that he also had a nine millimeter handgun in the apartment. Johnson was read his Miranda rights. Johnson stated that he had already talked to his attorney and that he wished to explain what had happened.
>
> Johnson stated that he saw an unfamiliar man looking in his window. Having no idea who the man was, Johnson went to get his gun but was unable to find it. Johnson said he then went to his bedroom and grabbed his loaded shotgun and opened the front door. Johnson claimed that when he opened the front door Wagner "rushed" him and that in response he "shot the sonofabitch." Johnson also stated that he had received telephone calls from the Ku Klux Klan (KKK) and that his office had recently been burglarized. On the drive to the police station, Johnson told the transporting officer that he was from Chicago and that "in Chicago we shoot people like this." He also stated that he did not mean to kill Wagner but "that sonofabitch had threatened [my] life before."
>
> Later that evening, Johnson gave a statement to the police. Johnson repeated that he did not wish to kill Wagner, but that he had received threats recently, and that Wagner should not have been looking in his window. Johnson also admitted that Wagner did not have a weapon in his hands but insisted that "the guy rushed me." Johnson also claimed that a couple of weeks prior to the shooting, people opened his apartment door, breaking the locks, and claiming they were there to inspect the fire extinguisher. Although Johnson had a blood alcohol content of .22% at 2:20 A.M., he was courteous, lucid, well-behaved, responsive to the officers,

---

1. Ind.Code § 35–42–1–3 (1993).

and did not appear to be impaired the evening of the shooting.

*Johnson,* 645 N.E.2d at 645.

Johnson raises one issue that we find dispositive: whether the trial court committed reversible error by admitting into evidence testimony of uncharged misconduct.

### Discussion

The State charged Johnson with Murder.[2] Johnson's lawyer made a motion *in limine* to prevent the prosecution from offering evidence of an incident that occurred approximately two months before the shooting of Mr. Wagner that gave rise to this case. In that incident, two people from the management of Johnson's apartment complex came to inspect the fire extinguisher in Johnson's apartment. Sherry Granger knocked on Johnson's door and twice announced housekeeping. When no one answered the door, Granger attempted to use her passkey to open the door. The security chain was on the door, and as the door opened a crack, Johnson shouted, "Don't come in I will shoot, don't come in I will shoot."

Johnson looked through the crack in the door, saw Granger and James Layman, and opened the door for them. When the door opened completely, Johnson was facing Granger and Layman, and he held a pistol in his hand about six inches from Granger's chest. After seeing their identification and after about a ten minute conversation, Johnson allowed Granger and Layman to inspect his fire extinguisher.

The trial court denied Johnson's motion to exclude evidence concerning this incident, overruled Johnson's objection when the prosecutor referred to the incident in opening argument, and overruled Johnson's objection when the prosecutor called Granger and Layman as witnesses.

The presentation of evidence in this case occurred between June 2nd and June 15th of 1992. Even before we adopted Indiana Evidence Rule 404(b) in 1994 or Federal Rule of Evidence 404(b) in October of 1992 in *Lannan v. State* (1992), Ind., 600 N.E.2d 1334, evidence of extrinsic acts, also sometimes

known as prior bad acts, was only admissible to show such things as motive, opportunity, intent, purpose, preparation, knowledge, identity, absence of mistake, or that the commission of a crime was part of a common scheme or plan. *E.g., Dockery v. State* (1994), Ind., 644 N.E.2d 573, 578.

■ In argument opposing Johnson's motion *in limine* to exclude evidence of the fire extinguisher incident, the prosecutor said the following:

We think that that evidence is admissible because it goes to the issue of motive and quite frankly our case is going to be predicated on the proposition that Dr. Johnson's motive was that he is a person from Chicago, from the street life in Chicago and that though he became a psychiatrist he never let go of that mentality and in Chicago you don't persist in knocking on someone's door when they don't answer because that someone in Chicago might blow your brains out.

In deciding to deny Johnson's motion *in limine,* the trial court said:

You can't put in bad acts to show that a person is guilty. But I am not really sure they are putting it in to show that he is guilty, I think Mr. Nave is correct they are putting it in to show the kind of person that he is. And his attitude.

. . . .

And I am not really sure it is motive but it shows his attitude, his manner, his demeanor, the way he treats people that come to his house.

In opening argument the prosecutor offered the jury the following preview of his case:

With regards to Dr. Johnson we believe the evidence is going to establish that Dr. Johnson is a person who never got very far away from his life in Chicago, Illinois. We believe that you are going to learn from the evidence that Dr. Johnson was a person who had grown up in Chicago, been around violence in Chicago, never lost his awe and appreciation or glorification of violence. You are going to learn that he raised himself by his education to the posi-

---

**2.** Ind.Code § 35–42–1–1 (1993).

tion of being a psychiatrist. That he is a very educated man and that he is able to speak in a very intelligent fashion. To present himself in a very acceptable manner, but that that is in fact a veneer. That underneath the veneer that there is the very same person who grew up in Chicago where violence was again glorified and appreciated.

Later during the trial, when calling Granger and Layman as witnesses, the prosecutor attempted to justify admission of their testimony about the fire extinguisher incident to show Johnson's intent. The trial court overruled Johnson's renewed objection to the evidence, saying:

And I am not sure it is actually motive, or I am not sure it is exactly intent, or I am not sure it isn't exactly common scheme or plan, but it is something like that. And in the context of this case I am satisfied that this evidence is admissible. I am absolutely satisfied.

The State's information charged Johnson with knowingly killing the victim. Johnson never claimed that he did not intentionally arm himself before meeting the victim at the door. We do not see how evidence of an incident in which the defendant confronted people other than and unrelated to the victim in this case and in which a shooting did not occur makes it more likely either that Johnson knew that he was killing the victim or that the shooting was not an accident. *See United States v. Hernandez,* 975 F.2d 1035, 1040 (4th Cir.1992); *United States v. Sanders,* 964 F.2d 295, 298 (4th Cir.1992).

The prosecution belatedly argued at trial, and now the State argues on appeal that the evidence was admissible to rebut Johnson's claim of self-defense made in statements to police, which statements the prosecution itself offered into evidence. We reject this argument. The trial court refused to give the jury an instruction on either accident or self-defense because it found there was insufficient evidence to justify either instructions. If there was insufficient evidence to justify an instruction on self-defense, self-defense was not an issue in the case, and Granger's and Layman's testimony could not have been relevant to rebut what was not there to be rebutted.

While we review a trial court's evidentiary rulings for an abuse of discretion, a trial court abuses its discretion when it admits evidence of extrinsic acts that are relevant to no issue other than character and to proof of behavior in conformity with that character. The record speaks for itself in this case. It was the very theory of the prosecution's case that Johnson, when he shot the victim, acted in conformity with what it alleged to be his violent character, born of his days in Chicago. The prosecution offered the evidence of the fire extinguisher inspection precisely to prove character, and the trial court permitted the prosecutor to discuss the incident during opening argument, over objection, and permitted Granger and Layman to testify, also over objection, explicitly for the forbidden purpose. The exclusive value of the evidence of the fire extinguisher incident related not to the crime but to the alleged criminal. *Hernandez,* 975 F.2d at 1040.

### Conclusion

Accordingly, having granted transfer, we now vacate the opinion of the Court of Appeals, Ind.Appellate Rule 11(B)(3), and reverse Johnson's conviction for Voluntary Manslaughter.

DeBRULER, DICKSON and SELBY, JJ., concur.

SHEPARD, C.J., concurs with separate opinion.

### SHEPARD, Chief Justice, concurring.

I join the Court's opinion, but wish to add a note about the possibility of a second trial.

Johnson made a tardy request to plead insanity. If that defense is permitted in a retrial, the admissibility of evidence about Johnson's behavior towards people on his front porch would be resolved by reference to rules other than the ones we apply today.